190 F.3d 963 (9th Cir. 1999)
 UNITED STATES OF AMERICA, EX EL., Plaintiff,
MARGARET A. NEWSHAM;
and MARTIN OVERBEEK BLOEM, Plaintiffs-Counter-Defendants-Appellants-Cross-Appellees,
v.
LOCKHEED MISSILES & SPACE COMPANY, INC., Defendant-Counter-Claimant Appellee-Cross-Appellant.
 Nos. 97-16704, 98-15111
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted November 6, 1998
Filed March 24, 1999
Amended September 10, 1999
 
 1
 [Copyrighted Material Omitted]
 
 
 2
 Guy T. Saperstein, Morris J. Baller, Susan Guberman-Garcia, Jeremy Friedman, Christopher J. Keller, Law Offices of Saperstein, Goldstein, Demchak & Baller, Oakland, California, for the plaintiffs-counter-defendants-appellants-cross appellees.
 
 
 3
 James J. Gallagher, Martin H. Kresse, Robert S. Brewer, Jr., Barbara J. Bacon, Law Offices of McKenna & Cuneo, Los Angeles, California, for the defendant-counter-claimant appellee-cross-appellant.
 
 
 4
 Appeals from the United States District Court for the Northern District of California. James Ware, District Judge, Presiding, D.C. No. CV-88-20009-JW.
 
 
 5
 Before: Betty B. Fletcher and A. Wallace Tashima, Circuit Judges, and Robert J. Bryan,[1] District Judge.
 
 OPINION
 BRYAN, District Judge:
 OVERVIEW
 
 6
 The appellants, Margaret A. Newsham and Martin Overbeek Bloem ("relators"), are qui tam plaintiffs under the False Claim Act ("FCA"), 31 U.S.C. SS 3729-3733. The relators alleged that Appellee Lockheed Missiles and Space Company, Inc. ("LMSC") submitted millions of dollars of false claims for excessive nonproductive labor hours on government projects. The relators appeal two of the district court's rulings: 1) dismissal of their claims because the court concluded that it lacked subject matter jurisdiction under the pre-1986 FCA, and 2) refusal to award attorneys' fees under California's Anti-SLAPP[2] statute, Cal. Civ. Proc. Code S 425.16, for the dismissal of LMSC's counterclaims. LMSC appeals the district court's application of Fed. R. Civ. P. 54(d)(1) and equitable considerations to deny LMSC's cost bill for a part of the case that was dismissed.
 
 
 7
 We have jurisdiction under 28 U.S.C. S 1291, and we affirm the district court in part and reverse in part.
 
 OVERVIEW OF QUI TAM ACTIONS
 
 8
 The FCA has two primary purposes: "to alert the government as early as possible to fraud that is being committed against it and to encourage insiders to come forward with such information where they would otherwise have little incentive to do so." United States ex rel. Biddle v. Board of Trustees of Stanford Univ., 161 F.3d 533, 538-39 (9th Cir. 1998) (citations omitted). The FCA established penalties for the commission of fraudulent acts, recoverable in a civil action known as a "qui tam" action. Id. at 535. The qui tam action is brought by a private individual known as a "relator" on behalf of both himself and the government. 31 U.S.C. S 3730(b). Once notified of the action, the government has the option to intervene, or declining intervention and to allow the relator to proceed on its behalf. S 3730(b)(2) and (c)(3). If the qui tam action is successful, the relator divides the civil penalties with the government according to S 3730(d). See Biddle, 161 F.3d at 538-39.
 
 
 9
 In the 1930s and 1940s, Congress became concerned about the number of
 
 
 10
 parasitic lawsuits copied from preexisting indictments or based upon congressional investigations. Such ill-motivated suits not only diminished the government's ultimate recovery without contributing any new information, but the rush to the courthouse put pressure on the government to make hasty decisions regarding whether to prosecute civil actions.
 
 
 11
 United States ex rel. Findley v. FPC-Boron Employees' Club, 105 F.3d 675, 679-80 (D.C. Cir. 1997). To address thisproblem, Congress placed limitations on the district court's jurisdiction, first in 1943, then in 1982, in 31 U.S.C.S 3730(b)(4) (1983), which stated: "Unless the Government proceeds with the action, the Court shall dismiss the action brought by the person on discovering the action is based on evidence or information the Government had when the action was brought."
 
 
 12
 Over time, Congress learned that this restriction essentially eliminated the financial incentive for private citizens to bring fraudulent conduct to the attention of the government, and the use of qui tam suits to fight fraud on behalf of the government dramatically declined. Findley, 105 F.3d at 680. On October 27, 1986, Congress again amended S 3730(b)(4) and re-codified it at 31 U.S.C. S 3730(e)(4)(A) (1998). This section provided that "no court shall have jurisdiction over a [qui tam] action . . . based upon the public disclosure of allegations in . . . [an] investigation . . . unless the action is brought by the Attorney General or the person bringing the action is an original source of the information." 31 U.S.C. S 3730(e)(4)(A).[3] The effect of this amendment was to "create[ ] a new cause of action" by eliminating the bar to actions based on information the government already knew, and to allow the original informant to litigate the action. Hughes Aircraft Co. v. United States ex rel. Schumer, 520 U.S. 939, 117 S.Ct. 1871, 1878 (1997); United States ex rel. Lujan v. Hughes Aircraft Co., 162 F.3d 1027, 1031 (9th Cir. 1998).
 
 FACTUAL AND PROCEDURAL BACKGROUND[4]
 
 13
 Between 1979 and 1988, LMSC had several "cost reimbursable"[5] contracts with various defense and intelligence agencies of the United States government. Newsham worked for LMSC as an analyst in its Sunnyvale, California plant from 1981 until she was discharged in 1984. Bloem worked at the same facility as a technician from 1979 until his voluntary termination in 1988. The relators here allege that LMSC filed millions of dollars in false claims for excessive nonproductive labor costs, including claims for employees' personal and unrelated business activities and time attributed to "icebox" employees.[6] The relators allege that LMSC billed this time to the government as contract labor hours. For example, the relators allege that one manager supervised the construction, by LMSC employees, of a complete airplane for his personal use at government expense.
 
 
 14
 In March 1984, Ms. Newsham and her attorney contacted agents of the Defense Contract Audit Agency ("DCAA"), which had responsibility for monitoring contract compliance of defense contractors, including LMSC. Ms. Newsham reported her observations, but she was not able to provide details of how time was billed or invoiced by LMSC, or what instructions LMSC employees had regarding the billing of their time. Mr. Bloem did not participate in that meeting, but the parties have agreed that his claims were indistinguishable from Ms. Newsham's allegations.
 
 
 15
 After receiving Ms. Newsham's report, the DCAA, in 1984, conducted several "operations" audits, including an icebox audit and a "non-touch" or non-manufacturing audit. The auditors did not investigate LMSC's time-keeping practices, its accounting for time charges, or the practice of charging for non-productive activities. The auditors found some discrepancies in billings and recommended adjustments, including a recommendation that LMSC reduce non productivity.
 
 
 16
 On January 8, 1988, the relators filed a qui tam action against LMSC under seal pursuant to the FCA, 31 U.S.C. S 3730(b)(2).[7] The relators alleged that LMSC knowingly charged labor hours to government contracts for employees engaged in nonproductive or personal activities, and sought damages, penalties, and other relief authorized by the FCA. The complaint was unsealed and served on LMSC in July 1988. In February 1989, the government filed a Notice of Declination to intervene in the case, and left the prosecution of the case to the relators as a private action on behalf of the United States.
 
 
 17
 Thereafter, LMSC moved to dismiss portions of the complaint for lack of subject matter jurisdiction based on the pre1986 version of the FCA, 31 U.S.C. S 3730(b)(4) (1983). The issue presented in the motion was whether the 1986 amendment to the FCA should be retroactively applied to a case filed after the amendment, but based on pre-1986 conduct. The district court denied the motion. On June 17, 1991, LMSC filed an answer and counterclaims wherein it denied the relators' claims and brought four California state law counterclaims. LMSC alleged that the relators had breached duties imposed by fiduciary obligations and loyalty, as well as contract and statute, and breached the implied covenant of good faith. The district court referred all pretrial matters to a Special Master pursuant to Fed. R. Civ. P. 53. The district court, on the Recommendation of the Special Master, granted the relators' motion to dismiss LMSC's counterclaims on August 2, 1995 and denied the relators' companion motion to strike and for attorneys' fees based on California's AntiSLAPP statute, Cal. Civ. Proc. Code S 425.16 (1992), discussed below.
 
 
 18
 The question of the retroactive or prospective application of the FCA's 1986 amendment -31 U.S.C. S 3730(e)(4)(A) -was settled in Schumer, 117 S.Ct. 1871(1997). There, the Supreme Court held that the statute does not apply retroactively. Based on Schumer, LMSC filed a motion for reconsideration, requesting that the relators' claims be dismissed pursuant to the pre-1986 FCA. One week before the hearing on this motion for reconsideration, the relators filed a motion for leave to file an amended complaint. In the proposed amended complaint, the relators brought new FCA claims, alleging that LMSC continued to submit bills for excessive labor costs after October 1986 and gave false information to the auditors which prevented the auditors from uncovering LMSC's alleged fraudulent activities.
 
 
 19
 On July 31, 1997, the district court issued its Order Dismissing Case after finding that the government had the information on which the case was based when the action was filed. The complaint was dismissed with prejudice as to the relators, and without prejudice as to the United States. The relators' motion to amend the complaint was denied. The relators timely appealed these rulings.
 
 
 20
 On August 22, 1997, after the district court had dismissed the relators' claims, LMSC filed a Bill of Costs. The district court denied LMSC's application for costs, first finding that LMSC was not a "prevailing party." Thereafter, on December 19, 1997, the district court grantedLMSC's motion for reconsideration. The district court then held that LMSC was a prevailing party, but again denied LMSC's Bill of Costs because there was no determination of the relators' claims on their merits, and because an award of costs would result in a severe hardship to the plaintiffs. LMSC filed a timely cross-appeal.
 
 STANDARD OF REVIEW
 
 21
 The standard of review of the district court's order dismissing claims for lack of subject matter jurisdiction is de novo. Galt G/S v. JSS Scandinavia, 142 F.3d 1150, 1153 (9th Cir. 1998). Any findings of fact of the district court are reviewed for clear error. Tucson Airport Author. v. General Dynamics Corp., 136 F.3d 641, 644 (9th Cir. 1998). The district court's order denying the relators' motion to strike LMSC's counterclaims is reviewed de novo. Harvey's Wagon Wheel, Inc. v. Van Blitter, 959 F.2d 153, 154 (9th Cir. 1992).
 
 
 22
 The district court's denial of costs is reviewed for an abuse of discretion. Crowe v. Wiltel Communications Sys., 103 F.3d 897, 900 (9th Cir. 1996). Whether the district court has the authority to award costs, however, is a question of law reviewed de novo. Russian River Watershed Protection Committee v. City of Santa Rosa, 142 F.3d 1136, 1144 (9th Cir. 1998).
 
 DISCUSSION
 
 23
 I. Whether the district court erred by dismissing the relators' claims based on a) pre-1986 FCA, and b) post-1986 FCA after amendment.
 
 
 24
 The district court failed to distinguish between pre-1986 claims and post-1986 claims, and as a result, the court erroneously dismissed the entire action. The relators' claims can be divided into two groups: claims charging LMSC with billing the government for excessive nonproductive work time before October 27, 1986 ("pre-1986 claims"), and claims that excessive charges continued after 1986, and that LMSC made false statements and misrepresentations to the DCAA auditors ("post-1986 claims").
 
 
 25
 A. Pre-1986 claims.
 
 
 26
 We must first determine which jurisdictional bar to apply to the pre-1986 claims. The Supreme Court in Schumer decided the issue of the retroactive application of the 1986 amendment and held that the 1982 version of the FCA should be applied to conduct that occurred before October 1986. Schumer, 117 S.Ct. at 1876. Recently, in Hughes Aircraft Co., we decided the issue left unresolved by the Schumer decision, that is, "whether the relevant conduct for purposes of non-retroactivity was the act of [the defendant] in presenting a false claim, or the public disclosure of that fact. " 162 F.3d at 1031 (citing Schumer, 117 S.Ct. at 1876 n. 4). When we considered the unfair effect of the retroactive application of the 1986 amendment, that is to "subject [the defendant] to a cause of action that did not exist at the time it engaged in the conduct later made actionable," we concluded "the crucial event for purposes of non-retroactivity is the alleged presentation by [the defendant] of a false claim, and not the public disclosure of that conduct." We held that the 1982 version of the FCA applies to all false claims presented before the effective date of the 1986 amendments (October 27, 1986), and that "the 1986 amendment applies to the presentation of false claims after its effective date." Id. As a result, we apply the 1982 version of the FCA to the relators' pre-1986 claims, and the post-1986 version to the relators' post-1986 claims.
 
 
 27
 The 1982 provision of the FCA, 31 U.S.C. S 3730(b)(4), required dismissal of the qui tam action if it was "based on evidence or information the Government had when the action was brought." In Pettis ex rel. United States v. Morrison-Knudsen Co., Inc., 577 F.2d 668, 674 (9th Cir. 1978), we held that the information on which the qui tam suit is based must be"sufficient to enable [the United States] adequately to investigate the case and to make a decision whether to prosecute." We stated that to require the information to be a "mirror image" of the relators' claims would "eliminate the bar" but that the government must possess more than "rumors." Id.
 
 
 28
 Here, the relators contacted government officials and reported their observations in 1984, four years before the qui tam action was filed. The DCAA found their information to be sufficient to start an investigation and conducted several audits targeted to respond to the relators' allegations. While the government decided not to prosecute the relators' claims, the government had sufficient information on which to base this decision, and possessed that information when the action was brought. There is nothing in the FCA which requires the government to intervene, even if it has sufficient information to justify intervention. We affirm the district court's dismissal of the relators' claims reported before October 1986.
 
 
 29
 B. Post-1986 claims.
 
 
 30
 As stated in their proposed amended complaint, the relators' post-1986 claims fall into two categories: 1) post1986 continuation of excessive labor bills, and 2) false statements and misrepresentations to DCAA auditors. The relators asserted that they did not learn of the basis for some of these claims until they conducted discovery after the 1988 filing of the original complaint. Here, the relators argue that the district court erred in its order of dismissal by relying on Schumer because the Schumer decision only addressed pre-1986 amendment conduct.
 
 
 31
 LMSC makes two principal arguments opposing the relators' positions. First, LMSC argues that when determining whether subject matter jurisdiction is proper the court must look to the original complaint and should not consider the post-1986 claims brought by the relators in their proposed amended complaint. LMSC cites Morongo Band of Mission Indians v. Cal. St. Bd. of Equal., 858 F.2d 1376, 1376 (9th Cir. 1988), for the principle that if the district court had no subject matter jurisdiction over the original complaint, then the court had "no power to do anything with the case except dismiss." (citations omitted). The Morongo decision goes on to state that, if jurisdiction was lacking, orders issued thereafter are "nullities." Id. at 1380.
 
 
 32
 We are not persuaded by this argument. Here, following the teaching of Morongo, we begin with the original complaint, filed in January 1988. The original complaint alleged improper billing both before and after the effective date of the 1986 FCA amendments. For example, in Paragraph 32 of the original complaint, the plaintiffs alleged that the "pervasive fraud and mischarging of labor hours and materials .. . has continued to the present and is still occurring now. " The plaintiffs went on to allege that the defendant "continue[s] to act with actual knowledge of the falsity of the information, and/or in deliberate ignorance and reckless disregard for the truth or falsity of the records, statements, and claims for payment or approval." As discussed above, the district court properly dismissed the pre-1986 claims for lack of subject matter jurisdiction. As to the allegations of improper billing continuing after 1986 ("post-1986 billing allegations"), however, we must apply the jurisdictional bar as modified by the 1986 amendments. If the post-1986 billing allegations can clear this bar, then the district court properly had subject matter jurisdiction over these aspects of the original complaint.
 
 
 33
 The amended FCA allows "qui tam suits based on information in the Government's possession, except where the suit was based on information that had been publicly disclosed and was not brought by an original source of the information." Hughes Aircraft Co., 162 F.3d at 1032 (quoting Schumer, 117 S. Ct. at 1876); see 31 U.S.C. S 3730(e)(4)(A). In other words, "if at the time a relator files a qui tam complaint, the allegations or transactionsof the complaint have been publicly disclosed, . . . the relator must show that he is an original source of the information in order for a district court to have jurisdiction over the lawsuit." Biddle, 161 F.3d at 540. Accordingly, in order to determine if the district court had subject matter jurisdiction over the relators' post-1986 billing allegations, we must resolve two questions: 1) whether the allegations were based upon information that had previously been publicly disclosed, and, if so, 2) whether the relators are original sources of such information. Id. at 1032-33.
 
 
 34
 As to the first inquiry, we ask whether the post-1986 billing allegations repeat "allegations that have already been disclosed to the public." Biddle, 161 F.3d at 538. The record before the district court contains no evidence suggesting that the post-1986 billing allegations were publicly disclosed prior to the unsealing of the relators' original complaint.
 
 
 35
 In any event, because we conclude that the record also supports the conclusion that the relators here were original sources with respect to these allegations, we need not definitively resolve the question of public disclosure. The statute defines "original source" as "an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information." 31 U.S.C. S 3730(e)(4)(B). We have elaborated on this statutory definition by demanding that the relator also have "a hand in the public disclosure of the allegations." Hughes Aircraft Co., 162 F.3d at 1033 (internal quotations omitted). Here, it is undisputed that the relators directly observed the nonproductive labor and improper billing that form the heart of their allegations. It is also undisputed that the relators voluntarily supplied this information to DCAA auditors in 1984. There is also nothing in the record suggesting these relators "sat quietly in the shadows" until others took up the fight. Wang v. FMC Corp., 976 F.2d 1412, 1419-20 (9th Cir. 1992) (holding that relator must have had a hand in public disclosure of the fraud).
 
 
 36
 Thus, based on our review of the post-1986 billing allegations contained in the relators' original complaint, we conclude that the district court properly had subject matter jurisdiction over this portion of relators' FCA action. The district court's dismissal of these post-1986 claims must thus be reversed.
 
 
 37
 The district court also denied relators' motion to amend their complaint based on its erroneous subject matter jurisdiction analysis. Consequently, the above analysis leads us to conclude that this ruling was also erroneous. In their first amended complaint, the relators revised certain factual allegations based on information obtained during discovery, including allegations relating to Lockheed efforts to deceive and mislead DCAA auditors. For the same reasons discussed above, it appears that the district court properly has subject matter jurisdiction over the claims contained in the first amended complaint to the extent such claims are based upon conduct postdating the effective date of the 1986 FCA amendments.
 
 
 38
 II. Whether California's Anti-SLAPP law should be applied to the dismissal of LMSC's state law counterclaims.
 
 
 39
 California's Anti-SLAPP law, Cal. Civ. Proc. Code S 425.16 was passed in January 1993 in response to the legislature's concern about civil actions aimed at private citizens to deter or punish them for exercising their political or legal rights. Wilcox v. Superior Court, 27 Cal.App.4th 809, 33 Cal.Rptr.2d 446 (1994).[8] The hallmark of a SLAPP suit is that it lacks merit, and is brought with the goals of obtaining an economic advantage over a citizen party by increasing the cost of litigation to the point that the citizen party's case will be weakened or abandoned, and of deterring futurelitigation. 27 Cal.App.4th at 816, 33 Cal.Rptr.2d at 450. The Wilcox decision goes on to observe that "[b]ecause winning is not a SLAPP plaintiff's primary motivation, defendants' traditional safeguards against meritless actions, (suits for malicious prosecution and abuse of process, and requests for sanctions) are inadequate to counter SLAPPs." 27 Cal.App.4th at 817, 33 Cal.Rptr.2d at 450. Therefore, the California legislature looked for procedural and substantive remedies for the prompt exposure, dismissal, and discouragement of SLAPP suits. Id.
 
 Section 425.16(a) states its purpose:
 
 40
 The Legislature finds and declares that there has been a disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances. The Legislature finds and declares that it is in the public interest to encourage continued participation in matters of public significance, and that this participation should not be chilled through abuse of the judicial process. To this end, this section shall be construed broadly.
 
 
 41
 Section 425.16(b)(1)[9] provides that when a SLAPP suit is filed, it "shall be subject to a special motion to strike," which is akin to a motion to dismiss. In order to prevail, a citizen party must make a prima facie showing that the SLAPP suit arises from any act by the citizen party "in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue." Id.; see also S 425.16(e) (defining "an act in furtherance of a person's right of petition or free speech"); Wilcox, 27 Cal.App.4th at 820, 33 Cal.Rptr.2d at 452. To make this determination, the court "shall consider the pleadings and supporting and opposing affidavits stating the facts upon which the liability or defense is based." S 425.16(b); Wilcox, 27 Cal.App.4th at 821, 33 Cal.Rptr.2d at 453. The burden then shifts to the SLAPP plaintiff to establish by a "reasonable probability" that the [SLAPP ] plaintiff will prevail on the claim and that the [citizen party's ] "purported constitutional defenses are not applicable to the case as a matter of law or by a prima facie showing of facts which, if accepted by the trier of fact, would negate such defenses. " 27 Cal.App.4th at 824-25, 33 Cal.Rptr.2d at 455. See also Bradbury v. Superior Court, 49 Cal.App.4th 1108, 1117, 57 Cal.Rptr.2d 207, 213 (1997). The prevailing party on a special motion to strike is entitled to attorney's fees and costs to compensate them for the expense of responding to the SLAPP suit and the motion. S 425.16(c);[10] Robertson v. Rodriquez, 36 Cal.App.4th 347, 362, 42 Cal.Rptr.2d 464 (1995). The issue of the application of this statute in federal court is one of first impression.
 
 
 42
 To address this issue, some additional procedural background is helpful. In June 1991, LMSC filed its counterclaims based on California state law against the relators, alleging breach of duties imposed by fiduciary obligations and loyalty, as well as by contract and statute and the impliedcovenant of good faith. At that time the Anti-SLAPP statute had not yet passed. The district court first dismissed the counterclaims on December 9, 1991. The court reasoned that such counterclaims were barred in qui tam litigation because they would "be a strong deterrent to genuine informer's actions, and contrary to the public policy underlying the [qui tam] statute," and "would allow wrongdoers to retaliate against whistle blowers, and [be] contrary to legislative intent."
 
 
 43
 The counterclaims were reinstated on July 14, 1994 based on United States ex rel. Madden v. General Dynamics Corp., 4 F.3d 827, 830 (9th Cir. 1993), wherein we held that a qui tam defendant could bring counterclaims for damages independent of a qui tam defendant's liability. The relators again moved to dismiss and to strike the counterclaims under both Fed. R. Civ. P. 12(b)(6) for failure to state a claim and the Anti-SLAPP statute, S 425.16. The relators also sought attorneys' fees and costs pursuant to S 425.16(c). On the recommendation of the Special Master, the district court granted the relators' motion to dismiss and denied their motion to strike and for attorneys' fees and costs. The court found that certain Federal Rules of Civil Procedure directly conflicted with the Anti-SLAPP statute: Rule 8 (requiring specificity in pleadings), Rule 12(f) (motions to strike), Rule 12(b)(6) (motions to dismiss for failure to state a claim), and Rule 56 (motions for summary judgment).
 
 
 44
 The relators argue that the district court's erroneous refusal to apply the Anti-SLAPP statute denied them of their substantive rights to attorneys' fees and costs under California state law, and failed to carry out the goals of Erie R. R. Co. v. Tompkins, 304 U.S. 64 (1938).
 
 
 45
 In determining whether the relevant provisions of California's Anti-SLAPP statute may properly be applied in federal court, we begin by asking whether such an application would result in a "direct collision" with the Federal Rules. See Walker v. Armco Steel Corp., 446 U.S. 740, 749-50 (1980); Olympic Sports Prods., Inc. v. Universal Athletic Sales Co., 760 F.2d 901, 914 (9th Cir. 1985). According to LMSC, California's statutory regime necessarily collides with Rules 8, 12, and 56. We disagree.
 
 
 46
 Only two aspects of California's Anti-SLAPP statute are at issue: the special motion to strike, Cal. Civ. P. Code S 425.16(b), and the availability of fees and costs, Cal. Civ. P. Code S 425.16(c).[11] We conclude that these provisions and Rules 8, 12, and 56 "can exist side by side. . . each controlling its own intended sphere of coverage without conflict." Walker v. Armco Steel, 446 U.S. at 752. A qui tam plaintiff, for example, after being served in federal court with counterclaims like those brought by LMSC, may bring a special motion to strike pursuant to S 425.16(b). If successful, the litigant may be entitled to fees pursuant to S 425.16(c). If unsuccessful, the litigant remains free to bring a Rule 12 motion to dismiss, or a Rule 56 motion for summary judgment. We fail to see how the prior application of the anti-SLAPP provisions will directly interfere with the operation of Rule 8, 12, or 56. In summary, there is no "direct collision" here.
 
 
 47
 LMSC correctly points out that the Anti-SLAPP statute and the Federal Rules do, in some respects, serve similar purposes, namely the expeditious weeding out of meritless claims before trial. This commonality of purpose, however, does not constitute a "direct collision" -there is no indication that Rules 8, 12, and 56 were intended to "occupy the field" with respect to pretrial procedures aimed at weeding out meritless claims. Cf. Cohen v. Beneficial Indus. Loan Corp ., 337 U.S. 541, 556 (1949) (holding that a state law requiring posting of bond in shareholder derivative suits couldbe enforced in addition to, and consistently with, Rule 23). The Anti-SLAPP statute, moreover, is crafted to serve an interest not directly addressed by the Federal Rules: the protection of "the constitutional rights of freedom of speech and petition for redress of grievances." Cal. Civ. P. Code S 425.16(a).
 
 
 48
 In the absence of a "direct collision" between a state enactment and the Federal Rules, we must make the "typical, relatively unguided Erie choice." Hanna v. Plumer, 380 U.S. at 471; accord 19 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and ProcedureS 4511 (2d ed. 1996). First, we note that LMSC has not identified any federal interests that would be undermined by application of the anti-SLAPP provisions urged by the relators here. See Byrd v. Blue Ridge Rural Elec. Coop., Inc., 356 U.S. 525, 537-40 (1958) (balancing state and federal interests in deciding whether to apply state law requiring that immunity question must go to judge, rather than jury). On the other hand, as noted earlier, California has articulated the important, substantive state interests furthered by the Anti-SLAPP statute. See Cal. Civ. P. Code S 425.16(a); Wilcox, 33 Cal.Rptr. at 451; cf. Gasperini v. Center for Humanities, Inc., 116 S.Ct. 2211, 2220 (1996) (in applying state law in diversity action, finding that while the state law at issue was plainly procedural, its objective was manifestly substantive).
 
 
 49
 We also conclude that the twin purposes of the Erie rule -"discouragement of forum-shopping and avoidance of inequitable administration of the law" -favor application of California's Anti-SLAPP statute in federal cases. Hanna, 380 U.S. at 468; see also Gasperini, 116 S.Ct. at 2220 n.8. Although Rules 12 and 56 allow a litigant to test the opponent's claims before trial, California's "special motion to strike" adds an additional, unique weapon to the pretrial arsenal, a weapon whose sting is enhanced by a entitlement to fees and costs. Plainly, if the anti-SLAPP provisions are held not to apply in federal court, a litigant interested in bringing meritless SLAPP claims would have a significant incentive to shop for a federal forum. Conversely, a litigant otherwise entitled to the protections of the Anti-SLAPP statute would find considerable disadvantage in a federal proceeding. This outcome appears to run squarely against the "twin aims " of the Erie doctrine.
 
 
 50
 For these reasons, we hold that the district court erred in finding that subsections (b) and (c) of California's AntiSLAPP statute could not be applied to LMSC's counterclaims. Because the district court concluded that the AntiSLAPP statute was inapplicable, it did not rule on the relators' motion to strike, nor on their motion for fees and costs. We remand to the district court so that it may rule on these issues.
 
 
 51
 III. Whether LMSC's appeal of the district court's application of Fed. R. Civ. P. 54(d)(1) to deny LMSC's cost bill is moot.
 
 
 52
 Because we reverse and remand in part for further proceedings, this litigation is not yet concluded, and it is premature to address costs. LMSC's appeal of the district court's denial of its costs bill is moot, and should be dismissed.
 
 CONCLUSION
 
 53
 On relators' appeal, No. 97-16704, we affirm in part and reverse and remand in part for further proceedings. LMSC's appeal, No. 98-15111, is dismissed as moot. Relators shall recover their costs on appeal as to both appeals.
 
 
 54
 No. 98-15111 DISMISSED. No. 97-16704 AFFIRMED in part, REVERSED AND REMANDED in part.
 
 
 
 Notes:
 
 
 [1]
 The Honorable Robert J. Bryan, United States District Judge for the Western District of Washington sitting by designation.
 
 
 [2]
 SLAPP refers to the name and focus of the statute -"Strategic Lawsuit Against Public Participation."
 
 
 [3]
 The full text of 31 U.S.C. S 3730(e)(4)(A) is: No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.
 
 
 [4]
 From its filing in 1988, this case has had a very long and tortuous procedural history. Our summary contains only those facts necessary to resolve this appeal.
 
 
 [5]
 A "cost-reimbursable" contract is one where the government reimburses LMSC for its costs in carrying out the contract and pays an additional amount as profit.
 
 
 [6]
 "Icebox" employees were individuals awaiting authorization by the government for "special access" in order to work on high security government contracts. The term "icebox" refers to the secured area where these employees were assigned.
 
 
 [7]
 31 U.S.C. S 3730(b)(2), in pertinent part, states: "The complaint shall be filed in camera, shall remain under seal for at least 60 days, and shall not be served on the defendant until the court so orders."
 
 
 [8]
 The Wilcox decision contains a comprehensive history of the SLAPP statute.
 
 
 [9]
 Section 425.16(b)(1) and (2) states in the entirety:
 (1) A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim.
 (2) In making its determination, the court shall consider the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based.
 
 
 [10]
 Section 425.16(c) states in its entirety: (c) In any action subject to subdivision (b), a prevailing defendant on a special motion to strike shall be entitled to recover his or her attorney's fees and costs. If the court finds that a special motion to strike is frivolous or is solely intended to cause unnecessary delay, the court shall award costs and reasonable attorney's fees to a plaintiff prevailing on the motion, pursuant to Section 128.5.
 
 
 [11]
 Accordingly, we express no opinion regarding the applicability of any other provisions of Cal. Civ. P. Code S 425.16 in federal court.