377 F.3d 1081
 VERIZON DELAWARE, INC.; Verizon New England, Inc.; Verizon Maryland, Inc.; Verizon New Jersey, Inc.; Verizon New York, Inc.; Verizon Pennsylvania, Inc.; Verizon Washington, D.C., Inc., Plaintiffs-Appellants,
v.
COVAD COMMUNICATIONS COMPANY; Dieca Communications, Inc., Defendants-Appellees.
Verizon Delaware, Inc.; Verizon New England, Inc.; Verizon Maryland, Inc.; Verizon New Jersey, Inc.; Verizon New York, Inc.; Verizon Pennsylvania, Inc.; Verizon Washington, D.C., Inc., Plaintiffs-Appellees,
v.
Covad Communications Company; Dieca Communications, Inc., Defendants-Appellants.
 No. 03-15453.
 No. 03-15557.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted April 15, 2004.
 Filed July 27, 2004.
 
 John Thorne, Arlington, VA, for plaintiffs-appellants/ cross-appellees Verizon Delaware, Inc., et al.
 Merril Hirsh, Washington, D.C., for defendants-appellees/ cross-appellants Covad Communications Co., et al.
 Appeal from the United States District Court for the Northern District of California; Jeremy Fogel, District Judge, Presiding. D.C. No. CV-01-20524-JF.
 Before: REINHARDT, NOONAN, and PAEZ, Circuit Judges.
 NOONAN, Circuit Judge:
 
 
 1
 The plaintiffs (collectively Verizon) appeal the judgment of the district court in favor of the defendants (collectively Covad). Federal question and diversity jurisdiction exist. The district court granted summary judgment to Covad, ruling that Verizon's state law claims against Covad were barred by the filed rate doctrine governing the charges of regulated carriers. The district court further denied Verizon's motion, filed after the judgment, to amend its complaint to sue on the basis of the filed tariffs.
 
 
 2
 We agree with the district court that the filed rate doctrine prevents the recovery of any charge not specified in the relevant tariff. We hold, however, that there is no barrier to Verizon suing to enforce what it has filed.
 
 
 3
 Covad cross-appeals the district court's denials of its motions to strike Verizon's original and first amended complaints. Covad also cross-appeals the dismissal of its counter-claims with prejudice. We affirm the denials of Covad's motions to strike Verizon's complaints but hold that summary judgment against Covad's counterclaims was improper because Covad was not given adequate notice that the sufficiency of its claims would be at issue or an opportunity to respond.
 
 FACTS
 
 4
 The several telephone companies here denominated "Verizon" are the corporate descendants of Bell Atlantic, a fusion of two former "baby Bell" telephone companies with another company. As an "incumbent local exchange" carrier or ILEC, Verizon is required to lease access to its network, "on rates, terms, and conditions that are just, reasonable, and nondiscriminatory," to newer market entrants described as "competitive local exchange carriers" or CLECs. Telecommunications Act of 1996, Pub. L. 104-104, § 251(c)(2)(D), 110 Stat. 56, 62 (codified at 47 U.S.C. § 251(c)(2)(D)). Covad is such a competitor. As required by the Telecommunications Act, Verizon has entered into interconnection agreements (IAs) with Covad setting out the rates, terms and conditions. 47 U.S.C. § 251(c)(1). Each IA is lengthy and detailed; the IA governing service in Delaware, for example, is 78 pages long and incorporates more than 140 pages of schedules and appendices plus an 11-page amendment. As mandated by the Telecommunications Act, the IAs have been approved by the relevant State commissions in the jurisdictions in which Verizon and Covad operate and filed for public inspection and copying. See 47 U.S.C. § 252(e),(h).
 
 
 5
 We take from Verizon's complaint its clear description of the technical side of the business:
 
 
 6
 Verizon's telecommunications network consists of three basic components: (1) low-capacity circuits running from each customer, (2) switches, and (3) high-capacity circuits between switches for bulk transmissions. The high-capacity circuits, or interoffice transport facilities, create a network backbone between switches. The switches are located in buildings known as "central offices." This part of the network is largely invisible to the public.
 
 
 7
 From the central offices, more familiar aspects of the network (such as overhead lines, poles, and boxes) carry individual pairs of copper wires, called "loops," a relatively short distance to a customer's premises. These loops were designed for voice communications and require costly upgrades to transmit large amounts of data efficiently.
 
 
 8
 Verizon is in the business of providing "plain old telephone service" over its telecommunications networks. Verizon is also in the business of providing high-speed Internet access using DSL [digital subscriber lines] technology. DSL works by placing special equipment at each end of the loop. This equipment enhances the basic loop circuit with a signal that dramatically increases the speed at which data can travel the "last mile" between the central office and the customer's premises....
 
 
 9
 Covad provides its service by placing DSL equipment in leased space in Verizon's central offices, and by leasing Verizon's loops and high-capacity circuits to connect end users to ISPs [internet service providers]. The practice of placing equipment in leased space in the ILEC central office is known as "collocation." In each central office in its service area, Covad collocates a Digital Subscriber Line Access Multiplexer. This device connects the loops incoming from end users to the high-capacity circuits running to ISPs.
 
 
 10
 When Covad leases loops, the part of the circuit for which Verizon is responsible is carefully defined.
 
 
 11
 It runs from the central office to a network interface device ("NID") at the customer's premises. Covad or the customer installs and maintains the inside wiring connecting the customer's computer and DSL modem to the NID. In single-family homes inside wiring may consist of a series of wires running from the NID along the baseboards to jacks in a few rooms. In office or apartment buildings the situation is much more complex. Loops come in to a large box of NIDs, each of which may be connected to many wires running to different locations.
 
 
 12
 As internet users know, problems arise with connections. Where Covad is leasing Verizon network elements, a Covad customer's problem can arise from Covad or from Verizon equipment and infrastructure. Each filed IA stated that "Covad accepts responsibility for initial trouble isolation and providing [Verizon] with appropriate dispatch information based on its test results." Each IA also provided:
 
 
 13
 If (i) Covad reports to [Verizon] a Customer trouble, (ii) Covad requests a dispatch, (iii) [Verizon] dispatches a technician, and (iv) such trouble was not caused by [Verizon] facilities or equipment in whole or in part, then Covad shall pay [Verizon] a charge set forth in Exhibit A for time associated with said dispatch. In addition, this charge also applies when the Customer contact as designated by Covad is not available at the appointed time.
 
 
 14
 Six of the nine IAs in the record further provided:
 
 
 15
 If as the result of Covad instructions, [Verizon] is erroneously requested to dispatch within a [Verizon] Central Office or to a POT [point of termination] Bay ("dispatch in"), [Verizon] may levy on Covad an appropriate charge. If as the result of Covad instructions, [Verizon] is erroneously requested to dispatch outside a [Verizon] Central Office or to a POT Bay ("dispatch out"), [Verizon] may levy on Covad an appropriate charge.
 
 The remaining agreements provided:
 
 16
 If as the result of Covad instructions, [Verizon] is erroneously requested to dispatch within a [Verizon] Central Office or to a POT [point of termination] Bay ("dispatch in"), a charge set forth in Exhibit A will be assessed per occurrence to Covad by [Verizon]. If as the result of Covad instructions, [Verizon] is erroneously requested to dispatch outside a [Verizon] Central Office or to a POT Bay ("dispatch out"), a charge set forth in Exhibit A will be assessed per occurrence to Covad by [Verizon].
 
 
 17
 Each agreement, as amended, contained a detailed schedule of fixed charges for trouble tickets erroneously requesting Verizon service. The Delaware IA, for example, authorized Verizon to charge Covad $44.63 if Covad erroneously requested a Verizon technician to examine a problem at one of Verizon's Central Offices (dispatch in) and $116.74 if Covad erroneously requested a Verizon technician to examine a problem at a Covad customer's location (dispatch out).
 
 
 18
 All but one of the agreements also incorporated a schedule governing Covad's right to a "billing credit" from Verizon if Verizon's service fell below performance standards. Trouble reports are factored into the performance metrics. The schedules also provided for an "adjustment of performance credit," stating:
 
 
 19
 The responsibility for authorizing a dispatch resides with Covad. Reductions will be made in the Performance Credit if necessary access is not available, or if a dispatch is made and no trouble is found, or if trouble is found to be on the Covad customer's side of the network demarcation point (e.g., in premises wiring or customer premises equipment), at a statistically higher rate than the same performance that [Verizon] experiences for [Verizon's] own retail customers.
 
 
 20
 The facts in the following paragraphs are disputed. For the purposes of deciding this appeal from summary judgment, we assume that Verizon's presentation, supported by affidavits, is true, leaving actual determination of the facts to such trial as may occur:
 
 
 21
 In the first quarter of 2000, Covad shirked its initial trouble-shooting responsibilities and issued numerous false trouble tickets leading Verizon to dispatch its technicians to solve problems arising from Covad's service and equipment. Each erroneous trouble ticket included "a representation of fact" that "after conducting internal troubleshooting, Covad has determined that the trouble lies with Verizon rather than with Covad's DSL service elements." Covad resorted to such conduct because it was racing to meet its quarterly projections for growth in customer base and did not have adequately trained personnel to keep up the pace. Moreover, Covad directed its technicians to "close" new orders even if the DSL service was not working and to refer the resulting problems to Verizon via trouble tickets. Telling customers that trouble tickets to Verizon were issued, Covad deflected blame onto Verizon. Verizon incurred needless expense and lost the opportunity to use its resources more profitably. Finally, pursuant to what Verizon refers to as "Performance Assurance Plans" ("PAPs") in effect in various states, which we take to mean the IAs' provisions on poor performance, Verizon gave Covad millions of dollars in price reductions induced by Covad's scheme.
 
 PROCEEDINGS
 
 22
 Verizon filed this suit in the district court on June 11, 2001. The court dismissed Verizon's original complaint with leave to amend for failure to state a claim upon which relief could be granted. On December 18, 2001, Verizon filed the operative first amended complaint, alleging California state law claims for intentional misrepresentation, negligent misrepresentation, and unfair competition in violation of Cal. Bus. & Prof. Code § 17200. Covad sought dismissal of that pleading on several grounds, including the filed rate doctrine. The court denied Covad's motion to dismiss, without prejudice to a motion for summary judgment based upon the filed rate doctrine. Covad then answered the first amended complaint and asserted three state law counterclaims for intentional misrepresentation, negligent misrepresentation, and unfair competition. Covad sought summary judgment on Verizon's claims based upon the filed rate doctrine. Verizon moved to dismiss Covad's claims on a number of grounds.
 
 
 23
 On Verizon's allegations, supported by affidavits, the district court gave this opinion (minor editorial changes have been made):
 
 
 24
 The filed rate doctrine, also referred to as the filed tariff doctrine, requires that common carriers and their customers adhere to tariffs filed and approved by appropriate regulatory agencies. Brown v. MCI WorldCom Network Servs, 277 F.3d 1166, 1170 (9th Cir.2002). Accordingly, no party may bring a judicial challenge to the validity of a filed tariff or bring a judicial proceeding to enforce any rate other than the rate established by the filed tariff. Id. "In sum, the filed-rate doctrine's purpose is to ensure that the filed rates are the exclusive source of the terms and conditions by which the common carrier provides to its customers the services covered by the tariff." Id. (internal citation and quotation marks omitted).
 
 
 25
 Two principles underlie the filed rate doctrine. First, the doctrine prevents carriers from engaging in price discrimination between customers (the non-discriminatory strand). Fax Telecommunicaciones, Inc. v. AT & T, 138 F.3d 479, 489 (2d Cir.1998). Second, the doctrine preserves the exclusive role of regulatory agencies in approving rates and keeping courts, which are far less competent to perform this function, out of the rate-making process (the nonjusticiability strand). Id. "The nonjusticiability strand recognizes that (1) legislatively appointed regulatory bodies have institutional competence to address rate-making issues; (2) courts lack the competence to set rates; and (3) the interference of courts in the rate-making process would subvert the authority of rate-setting bodies and undermine the regulatory regime." Id. (internal citation and quotation marks omitted).
 
 
 26
 In the instant case, the tariffs at issue are contained in the Interconnection Agreements (IAs) approved by the regulatory agencies of each state in Verizon's territory where Covad does business. Among the rates set forth in these IAs are the amounts Verizon may charge Covad for a "customer misdirect." A customer misdirect occurs when Covad opens a trouble ticket notifying Verizon of a problem with Verizon's equipment, causing Verizon to send a repair truck to the trouble site, and the problem ultimately is found to be with Covad's equipment rather than Verizon's. In these circumstances, Covad is required to reimburse Verizon for the cost of dispatching the repair truck. The IAs approved in the relevant states provide expressly the amount of compensation Verizon may recover for each misdirect.
 
 
 27
 Covad asserts that because the IAs establish the amounts Verizon may recover for each trouble ticket, any attempt to vary this amount is barred by the filed rate doctrine. The court agrees. The parties negotiated to the penny the amount Verizon may recover for each misdirect. The instant proceeding in effect is an effort to alter this rate by means of state law tort claims. However, as the Supreme Court has held, "[t]he rights as defined by the tariff cannot be varied or enlarged by either contract or tort." Am. Tel. and Tel. Co. v. Central Office Telephone, Inc., 524 U.S. 214, 227, 118 S.Ct. 1956, 141 L.Ed.2d 222 (1998).
 
 
 28
 Verizon asserts that the filed rate doctrine applies only to claims of customers against carriers, not to claims of carriers such as those presented here. While the vast majority of the cases addressing the filed rate doctrine do involve claims of customers, the Supreme Court has made clear that the doctrine applies equally to claims of carriers. [citing Arkansas Louisiana Gas Co. v. Hall, 453 U.S. 571, 101 S.Ct. 2925, 69 L.Ed.2d 856 (1981)]....
 
 
 29
 Verizon attempts to distinguish Arkansas Louisiana Gas Co. on the ground that the carrier's claims in that case did not sound in tort. However, the decision is couched in extremely broad language, and its rationale appears equally applicable to tort claims. Verizon argues that the non-discrimination rationale underlying the filed rate doctrine would not be served by imposing the doctrine upon claims of carriers. However, as noted earlier, an equally important policy underlying the filed rate doctrine is the preservation of the exclusive role of regulatory agencies in approving rates. This policy is served by application of the doctrine to claims of carriers.
 
 
 30
 Verizon argues that even assuming that the filed rate doctrine applies to claims of carriers, the doctrine does not apply in the instant case because Covad's conduct falls outside the scope of the negotiated customer misdirect rates set forth in the IAs. It points to language in the IAs requiring Covad to isolate the cause of the trouble initially and to issue a trouble ticket to Verizon only after confirming that Verizon's equipment is the source of the problem. It asserts that while it was contemplated that a small number of innocent mistakes would occur, the parties never contemplated that there would be wholesale, deliberate abuse of the trouble ticket system at the time they negotiated the customer misdirect rates. Verizon contends that because Covad failed to fulfill its initial troubleshooting responsibilities under the IAs, the customer misdirect rates set forth in the IAs simply do not apply.
 
 
 31
 Even assuming that Verizon is correct in its assertion that the misdirect rates set forth in the IAs do not apply in light of Covad's conduct, the court concludes that the filed rate doctrine nonetheless bars Verizon's claims. Boiled down to its essence, Verizon's argument is that it is entitled to recover a greater amount of money for each customer misdirect arising out of Covad's alleged scheme than is provided for in the IAs. Verizon characterizes this greater amount of money as "damages," but in effect it is seeking an increased rate for deliberate as opposed to accidental misdirects.
 
 
 32
 The IAs do not address deliberate misdirects specifically, and none of the cases cited by the parties addresses an analogous factual situation. However, all of the published cases addressing the filed rate doctrine hold unequivocally that "no one may bring a judicial proceeding to enforce any rate other than the rate established by the filed tariff." Brown, 277 F.3d at 1170; see also Am. Tel. and Tel. Co., 524 U.S. at 222, 118 S.Ct. 1956, 141 L.Ed.2d 222 (holding that a carrier's duly filed rate is the only lawful charge and that deviation from such rate is not permitted upon any pretext); Fax Telecommunicaciones, 138 F.3d at 482 (holding that "[c]arriers are prohibited from providing communications services except pursuant to a filed tariff, and may not charge, demand, collect or receive a rate other than the rate listed in the applicable tariff"); Wegoland Ltd. v. NYNEX Corp., 27 F.3d 17, 19 (2d Cir.1994) (holding that "the legal rights between a regulated industry and its customers with respect to rates are controlled by and limited to the rates filed with and approved by the appropriate regulatory agency"). "In addition to barring suits challenging filed rates and suits seeking to enforce rates that differ from the filed rates, the filed-rate doctrine also bars suits challenging services, billing or other practices when such challenges, if successful, would have the effect of changing the filed tariff." Brown, 277 F.3d at 1170.
 
 
 33
 Based upon these authorities, the court concludes that Verizon may not seek recovery of a new and higher rate for deliberate misdirects in this court. Such a rate does not appear in the tariffs filed with the appropriate regulatory agencies, and intervention by this court thus would undermine the role of those agencies as defined by the Supreme Court. Accordingly, the court will grant Covad's motion for summary judgment on the ground that Verizon's claims are barred by the filed rate doctrine.
 
 
 34
 Verizon Delaware, Inc. v. Covad Communications Co., 232 F.Supp.2d 1066, 1070-72 (N.D.Cal.2002).
 
 
 35
 The district court also dismissed Covad's counterclaims with prejudice based on a representation by Covad's counsel that Covad would dismiss its counterclaims without prejudice if Covad prevailed on summary judgment. See id. at 1072-73. In a post-judgment order, the district court clarified that its dismissal was a sua sponte entry of summary judgment in favor of Verizon.
 
 
 36
 Verizon appeals and Covad cross-appeals.
 
 ANALYSIS
 
 37
 The filed rate doctrine is a tough and durable barrier to any effort by a regulated carrier to collect more for its services than what is set by the public, filed tariff. See Evanns v. AT&T Corp., 229 F.3d 837, 840-41 & n. 10 (9th Cir.2000); cf. Square D Co. v. Niagara Frontier Tariff Bureau, Inc., 476 U.S. 409, 420-24, 106 S.Ct. 1922, 90 L.Ed.2d 413 (1986) (refusing to overrule the doctrine in the shipping context though "assum[ing]" it "was unwise as a matter of policy"). The doctrine, as Justice Stevens has vainly protested in dissent, was developed in a context different from modern markets. See Maislin Indus., U.S., Inc. v. Primary Steel, Inc., 497 U.S. 116, 138, 138-39, 145-50, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990) (Stevens, J., dissenting); Arkansas Louisiana Gas Co. v. Hall, 453 U.S. 571, 586, 608, 101 S.Ct. 2925, 69 L.Ed.2d 856 (1981) (Stevens, J., dissenting). It was a railroad-era contrivance, meant to curb monopolistic railroad companies like that portrayed in Frank Norris's The Octopus. But the doctrine survived into the age of the Internet.
 
 
 38
 The filed rate doctrine passed from transportation law to communications law through the tariff-filing requirement in the Communications Act of 1934. See Am. Tel. & Tel. Co. v. Cent. Office Tel., Inc., 524 U.S. 214, 221-22, 118 S.Ct. 1956, 141 L.Ed.2d 222 (1998); Ting v. AT&T, 319 F.3d 1126, 1130-31, 1138-42 (9th Cir.2003). "Until the 1990's, local phone service was thought to be a natural monopoly." AT&T Corp. v. Iowa Utils. Bd., 525 U.S. 366, 371, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999). Regulation was seen as the right recipe for monopoly.
 
 
 39
 The doctrine as applied to telecommunications was dealt a body blow by the Telecommunications Act of 1996. Responding to the desires of the Federal Communications Commission and believers in the free market, Congress gave the FCC broad authority to "forbear" from regulation where the FCC determined that it was not necessary to assure just, reasonable, nondiscriminatory charges or otherwise to protect consumers and further determined that forbearance was "consistent with the public interest." 47 U.S.C. § 160(a). Armed with this authority, the FCC began a massive program of deregulation in favor of regulation by the market, supplemented by state-law remedies. See Ting, 319 F.3d at 1132-1133. The radical shift in policy reflected a lack of concern that the purposes of the filed rate doctrine, as set out so clearly by the district court in this case, would go unfulfilled. The FCC noted "that in the absence of tariffs, consumers will be able to pursue remedies under state consumer protection and contract laws in a manner currently precluded by the `filed-rate' doctrine." Second Report & Order in the MATTER OF POLICY AND RULES CONCERNING THE INTERSTATE, INTEREXCHANGE MARKETPLACE, 11 F.C.C.R. 20,730, at ¶ 38, 1996 WL 633345 (1996); accord Order on Reconsideration in the MATTER OF POLICY AND RULES CONCERNING THE INTERSTATE, INTEREXCHANGE MARKETPLACE, 12 F.C.C.R. 15,014, at ¶ 77, 1997 WL 473330 (1997). The notion that price discrimination is best avoided by enforcing the filed tariff was discarded for a large part of the telecommunications industry. The competence of regulatory agencies as superior to that of courts was no longer recognized as the norm.
 
 
 40
 Detariffing — to use a horrid neologism — was in. Contract and state consumer protection laws could rule "in a detariffed environment." Order on Reconsideration, 12 F.C.C.R. 15,014 at ¶ 77. The Telecommunications Act had fundamentally restructured local telephone markets. See Iowa Utils. Bd., 525 U.S. at 371, 119 S.Ct. 721.
 
 
 41
 The new approach would be decisive in our case but for 47 U.S.C. § 160(d): "the Commission may not forbear from applying the requirements of section 251(c) or 271 of this title under subsection (a) of this section until it determines that those requirements have been fully implemented." Section 251(c)(2)(D) provides that ILECs must provide interconnection "on rates, terms, and conditions that are just, reasonable, and nondiscriminatory, in accordance with the terms and conditions of the agreement and the requirements of this section and section 252 of this title." Section 252 requires state regulators to approve interconnection agreements and file approved agreements for public inspection and copying. 47 U.S.C. § 252(e), (h). Filed rates, terms, and conditions must be available to all. 47 U.S.C. § 252(i). The IAs between Covad and Verizon were approved and filed pursuant to sections 251 and 252 and fall under the exception in section 160(d).
 
 
 42
 With the creation of the exception to forbearance and to the rule of contract, the market and state remedies, Congress preserved a niche where the filed rate doctrine appears to remain alive. The last phrase of the statutory exception — "until it determines that those requirements have been fully implemented" — is obscure. But we need not explore its meaning. No one contends that the FCC has made such a determination. Therefore, there is no forbearance. Cf. Goldwasser v. Ameritech Corp., 222 F.3d 390, 402 (7th Cir.2000). Apparently to assure the fair treatment of competitors by incumbents in a circumscribed field still needing correction of market imperfections, Congress and the FCC have left IAs to be ruled by tariffs.
 
 
 43
 Nonetheless, the filed rate doctrine now functions in the telecommunications field as an anomaly. It is a relic, open to repudiation by the FCC. The tariffs that are filed are not filed federally but with state agencies. Should not the law of the particular state govern each IA's enforcement? It is tempting to believe that, in Congress's new perspective, a suit for fraud of the kind before us should be allowed to proceed. See Jim Rossi, Lowering the Filed Tariff Shield: Judicial Enforcement for a Deregulatory Era, 56 Vand. L. Rev. 1591, 1596, 1609-10, 1625-27, 1644 (2003).
 
 
 44
 The Supreme Court has declared that an exception for affirmative fraud has never been rejected by that court. Arkansas Louisiana Gas Co., 453 U.S. at 583 n. 13, 101 S.Ct. 2925. Still, as the district court observed, such an exception has never been recognized. If a breach of this size is to be made in a filed tariff it is within the province of the Supreme Court to make it. Verizon cannot claim more for a fraudulent misdirect than the amount allowed by the tariff for any erroneous misdirect.
 
 
 45
 Verizon asserts that Covad's conduct caused other losses whose recovery is not barred by the filed rate doctrine, including: (1) price reductions given Covad and other carriers because, thanks to the false trouble tickets, Verizon appeared to be liable under the PAPs for inferior performance; (2) shunning by customers who were led to believe that Verizon was giving faulty service; (3) foregone profit Verizon could have earned from the resources it employed in responding to the false trouble tickets. The second and third claims are not persuasive. To obtain from Covad damages for opportunity costs, resources drained and customers lost would put a price for each false trouble ticket higher than that set by the tariffs for erroneous tickets and so is banned by the filed tariff doctrine.
 
 
 46
 Verizon may, however, enforce schedules incorporated into the filed IAs governing reduction of billing credits to Covad. To recoup overpayments is to enforce the filed rates. The filed rate doctrine "does not serve as a shield staving off claims ... based on the tariff itself." Brown v. MCI WorldCom Network Servs, 277 F.3d 1166, 1171 (9th Cir.2002) (internal quotation marks omitted). So long as Verizon seeks repayment in accord with the criteria in the filed rates, Verizon has a viable claim. Verizon may not, however, collect from Covad overpayment to other customers because of performance metrics skewed by Covad's alleged conduct because this charge would be in addition to the filed rate.
 
 
 47
 Verizon asked for injunctive relief in addition to damages. Specifically, Verizon notes that, by the terms of the IAs, "Covad accepts responsibility for initial trouble isolation and providing [Verizon] with appropriate dispatch information based on its test results." To enjoin Covad to observe this undertaking would not be to subvert the filed tariff but to enforce it. Accordingly, Verizon is not precluded from seeking an injunction on this basis. See id. at 1171-72.; cf. Marcus v. AT&T Corp., 138 F.3d 46, 58, 62-63 (2d Cir.1998).
 
 
 48
 In determining whether to issue an injunction, the district court may be required to determine the scope of the trouble-shooting obligations that Covad assumed when it agreed to the IA. This court has held that the filed-rate doctrine does not preclude judicial proceedings to interpret the provisions of a tariff or proceedings to enforce the tariff. Brown, 277 F.3d at 1171-72. Accordingly, interpretation of Covad's obligations by the district court would be permissible under the filed-rate doctrine.
 
 
 49
 As the judgment of the district court must be vacated to permit Verizon to proceed with its case on the price concessions and enforcement of Covad's obligations, the denial of Verizon's motion to amend its complaint cannot be sustained on the ground that it came after judgment had been entered. As matters now stand, a motion to amend would come before trial on the merits of the two issues remanded. The normal rules permitting amendment should govern. See Fed. R. Civ. P. 15 (providing that leave of the court to amend "shall be freely given when justice so requires"); Eminence Capital, LLC v. Aspeon, Inc., 316 F.3d 1048, 1051 (9th Cir.2003) (per curiam) (stating that Rule 15 "is to be applied with extreme liberality") (internal quotation marks omitted).
 
 Covad's Cross-Appeal
 
 50
 
 Covad's motion to strike under Cal. Civ.Proc. Code § 425.16
 
 
 
 51
 Covad appeals the district court's denial of its motion to strike Verizon's first complaint pursuant to California's anti-Strategic Lawsuits Against Public Participation ("anti-SLAPP") statute, Cal. Civ.Proc. Code §425.16. The purpose of the anti-SLAPP statute is "to allow early dismissal of meritless first amendment cases aimed at chilling expression through costly, time-consuming litigation." Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1109 (9th Cir.2003) (internal quotation marks omitted). The anti-SLAPP statute specifies that it should be "construed broadly," §425.16(a), and allows a defendant to move to strike a plaintiff's complaint if the complaint stems "from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue." §425.16(b)(1). The statute, as potentially relevant here, applies to any "conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." § 425.16(e)(4). But see § 425.17(c) (stating that § 425.16 does not apply to certain causes of action against businesses that make statements about the goods, services, or business operations of their competitors).
 
 
 52
 We have previously confirmed that defendants sued in federal courts can bring anti-SLAPP motions to strike state law claims and are entitled to attorneys' fees and costs when they prevail. See Vess, 317 F.3d at 1109-10; United States ex rel. Newsham v. Lockheed Missiles & Space Co., 190 F.3d 963, 971 (9th Cir.1999). But we have also cautioned that "[p]rocedural state laws are not used in federal court if to do so would result in a direct collision with a Federal Rule of Civil Procedure" and have accordingly refused to apply certain discovery-limiting provisions of the anti-SLAPP statute because they would conflict with Fed. R. Civ. P. 56. Metabolife Int'l, Inc. v. Wornick, 264 F.3d 832, 845-46 (9th Cir.2001) (internal quotation marks omitted).
 
 
 53
 Covad contends that the district court erred by deferring consideration of Covad's special motion to strike Verizon's original complaint under the anti-SLAPP statute pending receipt of Verizon's first amended complaint. Although the Vess court was not specifically considering the propriety of allowing a plaintiff to amend its complaint before ruling on an anti-SLAPP motion, the posture of that case was similar to the present case: "All three defendants filed motions to strike pursuant to California's anti-SLAPP statute and for attorneys' fees under that statute. Without ruling on the motions, the district court granted Vess leave to file a first amended complaint." Vess, 317 F.3d at 1102. The Vess court conducted its analysis of the defendants' anti-SLAPP motions with respect to Vess's first amended complaint as opposed to Vess's original complaint.
 
 
 54
 As Vess implicitly suggests, granting a defendant's anti-SLAPP motion to strike a plaintiff's initial complaint without granting the plaintiff leave to amend would directly collide with Fed. R. Civ. P. 15(a)'s policy favoring liberal amendment. Covad argues that to accept the approach of Vess promotes forum shopping, encouraging plaintiffs to sue in federal courts rather than state courts because they would get "one free shot at a SLAPP suit before amending the complaint." But a direct collision with a federal procedural rule exists. We do not need to proceed to the secondary test of "balancing the state interest in its procedural rule with the twin purposes of the Erie doctrine, `discouragement of forum-shopping and avoidance of inequitable administration of the laws.'" Metabolife, 264 F.3d at 845 (quoting Hanna v. Plumer, 380 U.S. 460, 468, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965)). Moreover, the purpose of the anti-SLAPP statute, the early dismissal of meritless claims, would still be served if plaintiffs eliminated the offending claims from their original complaint. If the offending claims remain in the first amended complaint, the anti-SLAPP remedies remain available to defendants.
 
 
 Covad's Rule 9(b) Motion
 
 
 55
 Verizon's first amended complaint gave Covad adequate notice of the fraudulent conduct against which it had to defend. The complaint was not a fishing expedition for the "discovery of unknown wrongs" committed by Covad without "some factual basis" for the allegations made by Verizon. Bly-Magee v. California, 236 F.3d 1014, 1018 (9th Cir.2001) (internal quotation marks omitted). The district court properly denied Covad's Rule 9(b) motion.
 
 
 Dismissal of Covad's Counterclaims
 
 
 56
 The district court dismissed Covad's counterclaims based on Covad's representation that it would agree to dismissal of its counterclaims if it were to prevail on its motion for summary judgment against Verizon. Covad offered, however, to dismiss its counterclaims without prejudice. After Covad sought to amend the judgment to clarify that the dismissal was without prejudice, the district court changed course and indicated that although it "did base its dismissal of Covad's counterclaims in part on Counsel's offer of dismissal," it had "in effect granted summary judgment sua sponte as to the counterclaims, and if the basis of the Court's ruling as to Verizon's claim were held to be erroneous or otherwise not applied to Verizon's claims, there would be no basis to apply it to Covad's counterclaims either."
 
 
 57
 Before a court makes a sua sponte grant of summary judgment, "a litigant must be given reasonable notice that the sufficiency of his or her claim will be in issue." Buckingham v. United States, 998 F.2d 735, 742 (9th Cir.1993). When the court dismissed Covad's counterclaims, Verizon had not yet responded to Covad's counterclaims. Nothing in the record suggests that Covad had reasonable notice that the sufficiency of its counterclaims would be in issue. The district court erred by entering a sua sponte grant of summary judgment on Covad's counterclaims. Accordingly, we reverse the district court's grant of summary judgment in favor of Verizon on Covad's counterclaims without prejudice to a subsequent motion for summary judgment once Covad has been afforded adequate notice that the sufficiency of its counterclaims will be at issue and has been given an opportunity to respond.
 
 
 Conclusion
 
 
 58
 For the reasons stated, the judgment of the district court granting summary judgment to Covad on Verizon's claims is AFFIRMED in part and REVERSED in part. The judgment of the district court denying Covad's motions to strike Verizon's complaints is AFFIRMED; the judgment of the district court granting Verizon summary judgment on Covad's counterclaims is REVERSED without prejudice to summary judgment after Covad is given adequate notice and an opportunity to respond. The case is REMANDED for proceedings consistent with this opinion.